, ADELAIDE M. FUNK

v.

ROBERT LAWSON ET AL.

1. AGREEMENT TO SUPPORT GRANTOR.—An agreement to support the grantor where it forms a substantial part of the consideration, in a conveyance of land, is in the nature of a secret trust for the benefit of the grantor, and if the transaction leaves the grantor indebted beyond his means of payment, will avoid the conveyance, as to the creditors not fully provided for.

2. PRESUMPTION OF FRAUD.—In the absence of proof to the contrary such an agreement will be presumed to have been a material part of the consideration. But the *prima facie* presumption of fraud may be rebutted by showing such agreement was a mere gratuity and did not enter into the consideration. Where the amount paid per acre is below the fair value of the land, the presumption of fraud is not overcome.

3. KNOWLEDGE OF ORIGINAL LIABILITY—DEFECTIVE TITLE.—Parties who knew of an original liability of a grantor are not warranted in assuming it has been paid, without inquiry made. If they take a deed, purporting to give them all of grantor's available means of payment, they must be held to have taken a title affected by whatever of infirmity, if any, was imparted by their agreement to support grantor as part of the consideration.

4. DELIVERY AND INDORSEMENT OF NOTE—IMMATERIAL ALLEGATIONS.—A husband's possession of a note after notice to his wife of his indorsement of it to her, and the receipt of the husband at the post-office of another note, indorsed and mailed to the wife by the husband's brother, is a possession and sufficient delivery to the wife, and she succeeds by virtue of the negotiability of the notes, to the rights of all assignors. In an action on the notes it is immaterial for parties, not creditors of the husband, to maintain that the notes were assigned to the wife to defraud creditors.

5. SPECIAL CONTRACT NECESSARY FOR SON TO RECOVER FOR SERVICES IN FAMILY AFTER BECOMING OF AGE.—A son remaining and working in his father's family, after becoming of age, can not recover for such services without a previous contract therefor. Where a special contract is claimed to have been verbally made years before, and such a secret and stale claim is alleged as the liability of grantees to grantors, a court of equity must hold grantees with great strictness to show that the agreement to support the grantor and his wife was not a substantial part of the consideration.

APPEAL from the Circuit Court of Ogle county; the Hon. WILLIAM BROWN, Judge, presiding. Opinion filed February 9, 1883.

Mr. J. W. ALLABEN and Mr. WM. BARGE, for appellant;

that where vendor and vendee are father and son, living together, the evidence of good faith in a contract of sale, as against creditors, must be indisputable, cited Gibson v. Hill, 23 Tex. 77; Brice v. Myers, 5 Ohio, 126; Welsh v. Kellogg, 11 Ohio, 398; Lake v. Doud, 10 Ohio, 423.

Equity will not sustain executory considerations in such cases: Robinson v. Stewart, 10 N. Y. 189.

As to the inference of fraud: Carter v. Gunnels, 67 Ill. 270; Stoddard v. Wood, 24 Tex. 622; 1 Story Eq. Jur. 190.

An arrangement by which the grantee, as part of the consideration, is to support the grantor during his life, is a legal fraud and renders the conveyance void as to creditors: Moore v. Wood, 100 Ill. 451; Bridgeford v. Riddell, 55 Ill. 264; Bump on Fraud. Con. 246; Power v. Alston, 93 Ill. 590; Guffin v. First Nat. Bank, 74 Ill. 262; Emerson v. Bemis, 69 Ill. 537; Mills v. Hometh, 19 Tex. 257; Phelps v. Curts, 80 Ill. 112.

As to the recovery of a son, after becoming of age, for services as a member of the family: Guffin v. First Nat. Bank, 74 Ill. 262.

A grossly deficient consideration renders conveyance fraudulent as to creditors: Monell v. Sherrick, 54 Ill. 269; Halbert v. Graves, 4 Monroe, 583; Hessing v. McCloskey, 37 Ill. 341; Jaffers v. Aneals, 91 Ill. 487; Haney v. Nugent, 13 Wis. 315; Lloyd v. Higbee, 25 Ill. 603.

Fraud in one instance vitiates the entire consideration: Strohm v. Hayes, 70 Ill. 45; Weisiger v. Chrisholm, 22 Tex. 670.

It is not necessary to prove actual participation of grantee in fraudulent intent in order to avoid the sale: 20 U. S. Dig. 1860, Mo. 58.

Mr. O. C. Lathrop, for appellees; that even if the father made the conveyance expressly to hinder appellant in collecting his claim, the conveyance is good, as the grantees did not know of the existence of such claim at the time, cited Matthews v. Jordan, 88 Ill. 602; Miller v. Kirby, 74 Ill. 242; Hatch v. Jordan, 74 Ill. 414; Gridley v. Bingham, 51 Ill. 153;

Nelson v. Smith, 28 Ill. 495; Ewing v. Runkle, 20 Ill. 448; Hessing v. McCloskey, 37 Ill. 342; 12 Cent. L. J. 402; R. S. Ill. 1874, Chap. 59, § 5.

Appellees' promise to pay their father's indebtedness was a valuable consideration in part for the conveyance: Eddy v. Roberts, 17 Ill. 508; 12 Cent. L. J. 207; Ralston v. Wood, 15 Ill. 171; Dubbs v. Findley, 2 Pa. 397; Tyberandt v. Rauche, 96 Ill. 71; Waterman v. Donaldson, 43 Ill. 32.

When there is an adequate consideration paid, the further agreement to support grantors, amounts to a mere gratuity: Albee v. Webster, 16 N. H. 362; Slater v. Dudley, 18 Pick. 375.

As to the proof of an allegation of fraud: Shinn v. Shinn, 91 Ill. 479; Pratt v. Pratt, 96 Ill. 184.

As to the question of liberal compensation: Uhlich v. Muhlke, 61 Ill. 503.

Pleasants, J. This was a creditor's bill filed by appellant to subject to the satisfaction of her judgment against Robert Lawson and Samuel H. Shoop, certain lands alleged to have been fraudulently conveyed by the former and his wife to their sons, John and George, to hinder and delay his creditors, and especially the complainant. Shoop made default. The other defendants filed a joint and several answer, setting forth that at the time of the conveyance complained of the grantees therein had no " personal " knowledge of the existence of the indebtedness on which her judgment was founded—that said Robert was only a surety therefor and then believed it had been fully paid—and that the conveyance was made in good faith for valuable and adequate consideration, consisting, besides the amount therein mentioned as such, of the release by the grantees of certain claims they had against their father, their assumption of other debts owing by him, and their agreement to support him and their mother during their lives. This answer was signed by said Robert in his last illness and within twenty-four hours of his death; of course his deposition was not taken.

It was proved and admitted that some time prior to March

2, 1878, he signed with Shoop a note of $1,000 to Theodore O. Funk, the husband of complainant, for money loaned by the payee to Shoop, and on that day another of $700 to M. I. Funk, a brother of said Theodore, which was in part payment of the first and credited by indorsement thereon. These notes having been assigned to complainant were by her in October, 1879, put in judgment for $1,166.26, on which execution was duly issued and returned unsatisfied before the filing of this bill. Shoop had failed in business on the 3d day of May preceding, without making any provision for them, and on the 6th, which was about the time when they were assigned to complainant, the deed here in question was executed. It purports to convey absolutely, in fee, for the consideration of $2,330, several tracts composing one body of land containing about 240 acres, being the farm on which said Robert had resided continuously for over thirty years, and his sons all their lives.

At the same time he transferred to them all his personal property (excepting the household furniture and paraphernalia of himself and his wife), consisting of live stock, grain and farming utensils; most of which was scheduled, upon what appears to be a low estimate, at $790, and the residue is shown to have been reasonably worth not less than $350—in all $1,140.

The consideration for the conveyance and transfer appears from the other papers executed at the same time, which were: 1, an article whereby, in consideration that their father sells to them the farm of about 239 acres upon which he now lives, and gives them a bill of sale of all his personal property thereon, said John and George agree to release him from all claim for wages which he now owes them, to "keep" him and their mother during their lives, and to pay all the claims against him or the farm, of the parties therein named (without specifying any amount as due to either or to all in the aggregate), and stated to be "all the debts he now owes"; 2, an itemized bill of sale from him to them of personal property estimated at $790, to which is appended a receipt of payment therefor "in full in labor," and 3, a statement of the amount claimed to be due them respectively for work on the

farm—being to John for seven years and to George for six, at $240 each per year, making in all $3,120—with a receipt of payment " in full in personal property $790, and $2,330 (the consideration expressed in the deed) in land subject to incumbrance."

It is admitted that they received other personal property besides that specified in the bill of sale, viz.: two brood sows, thirty winter pigs, forty bushels of oats, ten bushels of wheat and a quantity of corn not exactly known, but of which they immediately sold 1,000 bushels and 45 lbs. for $280.25, and afterward fed the residue—worth altogether, as above stated, $350.

The incumbrance on the farm was $2,400, and the personal liabilities assumed, although stated by John generally in an aggregate including said incumbrance at a larger sum, are shown by his own specification of every item thereof except a few which he said he could not then recollect but not exceeding in all $150, to have been $2,584.

Exclusive, then, of the agreement to support the grantors, the consideration for the transfer of the land and personal property was the release by the grantees of their claims for

Wages.....................................$3,120
Their assumption of the incumbrance...... 2,400
And of the liabilities of the grantor........ 2,584    $8,104
Deducting the value of the personal property            1,140
                                                   ————
There is left for the land.................            $6,964

which is at the rate of $29 per acre.

Robert Lawson was then fifty-nine years of age, had two younger sons who served him faithfully as they were able during their minority, and was liable as a principal to the creditors for about $2,000 besides the debts so provided for. Yet by this conveyance and transfer he appears to have divested himself absolutely of all his property that was subject to execution, and renounced all business and hope of business, with all means of acquiring anything to leave to his younger children or to satisfy these claims; while by an outside agreement he reserved or secured, as part of the consideration, be-

yond the reach of creditors, a support for himself and his wife during their lives, and this support was doubtless expected to be furnished upon the land so conveyed and out of the products thereof.

Such an agreement, when it forms a substantial part of the consideration and of the real inducement to the transfer, is in the nature of a secret trust in the land conveyed, for the benefit of the grantor; and if the transaction leaves him indebted beyond his means of payment, will avoid the conveyance as to creditors not fully provided for. In such a case a court of equity will not enter upon the task of determining the value thus reserved or secured, but irrespective of its amount will hold the conveyance a nullity as between the grantee and such creditors, and the property liable for their demands. Bump on Fraudulent Conveyances, pp. 246-7, with citations in note, and Moore v. Moore, 100 Ill. 451; in which the rule, with the authorities, is so fully presented that we here refer to no other. They hold further, that in the absence of proof to the contrary, an agreement to support the grantor will be presumed to have been a material part of this consideration. The conveyance in this case, then, is *prima facie* void as against such creditors.

But the grantees contend that when it was executed appellant was not a creditor—that the notes in judgment had not then been indorsed and were never delivered to her.

From the testimony on this subject we incline to think she was; holding that her husband's possession of the one after notice to her of its indorsement, and his receipt at the postoffice, of the other, indorsed and mailed to her by his brother, were her possession and a sufficient delivery; and further, that whensoever assigned, she succeeded, by virtue of their negotiability, to all the rights of the assignors therein.

It is also said that both these notes were his, and the assignments to her made and procured by him without any valuable consideration, to defraud his creditors. If this were so it would be immaterial. These notes evidenced an actual indebtedness to him, which had not been paid. If he gave them to his wife, directly or indirectly, and to the prejudice

of his creditors, the Lawsons could not object.   They were never his creditors.

Again; they claim that when they took their deed they knew nothing of the debt, and their father supposed it had been paid, so that there could not have been any purpose on the part of either to defraud appellant.   This rests upon the testimony of John Lawson alone, an interested witness, whose memory is shown in several instances to be unreliable, and whose account of the matter involves some serious difficulties.   He says he had heard of the note to Funk for $1,000, but that shortly before this deed was executed his father told him that Shoop had told him it was paid and had shown it to him fully paid.   His father's lips were sealed in death, and could not be opened to confirm or contradict this statement.   His unsworn answer, signed on his deathbed, is not evidence.   That he knowingly told his son a falsehood we should be reluctant to believe, even upon the testimony of the latter, in his own interest; and yet, that Shoop never did show him the note fully paid is absolutely certain.   There is now no pretense that on its face or back it so appears, or ever did.   It was not in fact fully paid.   Shoop swears that he never so told him.   It would have been an uncommonly bold lie, even for a common liar, with Funk, the holder, so near at hand to expose him.   And J. W. Brown, an intimate friend and brother mason of the same lodge, testified, without objection, that soon after the deed was executed Robert Lawson told him that Shoop had shown him the note with one, or two, or several indorsements (he could not say which), and said it would soon be paid; and that Shoop or Funk, the witness did not remember which, had torn up the note, and he (Lawson) supposed it was the one he had signed, and that it was paid; and that there was fraud in the matter on the part of Shoop and Funk, and what he had done in reference to his property, was done to protect himself; that he did not consider it an honest debt.

George Lawson, the other grantee, admits that he had heard talk of his father's signing the note with Shoop, but does not pretend to have ever heard that it was paid.   And

finally the answer of appellees only goes so far on this point as to deny " personal knowledge " of the debt.

From all the evidence it seems quite improbable that Robert Lawson ever told John the $1,000 note was paid, or that Shoop had said so or shown it paid. Lawson knew that $700 of it was paid and credited on it, but he also knew that this amount was paid by giving another note for it, which he also signed; and it is singular that he is not represented by any of the testimony as having claimed that he supposed the latter was paid. We are constrained to believe that John's statement is a perversion—we do not say a willful perversion—of one made to him by his father like that he made to Brown, and which may have been substantially true, though it did not justify a belief that the original note was paid in full, or the other even in part. He could hardly have intended so to represent.

Knowing then that the original had been given, these grantees we think were not warranted in assuming, without inquiry of Funk or Shoop who were so easily accessible, that the liability of their father thereon had been fully extinguished; and knowing also that their deed and bill of sale purported to give them all of his available means of payment, they must be held to have taken a title affected by whatever of infirmity, if any, was imparted by their agreement to support him as part of the consideration.

Upon these facts the effect of that agreement was, as above stated, to make the conveyance *prima facie* fraudulent and void in equity, as against creditors, because it is presumed to have been a substantial portion of the consideration, secured by the parties, to the use of a debtor or grantor beyond the reach of creditors by process at law.

But it is not doubted that the presumption may be rebutted and the *prima facie* case of fraud so made overcome by proof that the support thus agreed to be furnished was in fact only nominally a part of the consideration, a gratuity, out of filial affection or gratitude, or really in excess of the actual value of the property otherwise fully paid. In that case, although expressly stated to be part of the consideration the agreement

will not vitiate the conveyance, because it does no wrong to the creditor.   Bump, *ubi supra;* Albee v. Webster, 16 N. H. 362; Slater v. Dudley, 18 Pick. 373; Moore v. Wood, 100 Ill. 451.

This brings us to consider whether $29 per acre was the full and fair value of the land.   Here the burden of proof is upon the grantees, for it will not be presumed that they agreed to pay more than its value, even to their father.

They produced five witnesses, of whom two were brothers and one a brother-in-law of the grantor, whose estimate ranges from $32.50 to $37, and averages $34.50.   Appellant produced seven, all indifferent as between the parties, who range from $32.50, by one, the lowest, to $50, by one, the highest, and average a fraction over $40.

Some of the latter say that upon a forced sale it probably would not bring quite so much as their estimate, but we think the fair preponderance of the testimony shows it worth about that sum.   This would make its value $2,640 more than the consideration claimed to have been paid for it, exclusive of the support agreed to be furnished to the grantors.   The average of all the testimony on both sides is a fraction over $38, making an excess of $2,160, which is perhaps the nearest to the real difference.   At the rate shown by the average of defendant's testimony, it would be $1,320, which is more than the amount of complainant's judgment.   It seems to us, therefore, that the presumption of fraud was not overcome.

This conclusion as to value and consideration, unfavorable to the grantees as it is, concedes what appellant does not, that their father really owed them $3,120, as claimed.

It is settled that a son remaining and working in his father's family after becoming of age, can not recover for such services without a previous contract therefor.   They are presumed to be rendered gratuitously, and the father is under no legal obligation to compensate him.   Guffin v. The First National Bank of Morrison, 74 Ill. 262.

In this case the grantees respectively claim that they had such a contract.   John alone testifies to that alleged to have been made with him.   He says it was made in the spring of

1871 when he attained his majority, in the field, verbally, with no one else present, and provided that he should have twenty dollars per month besides his board and clothing and all the spending money he should need; and that under that contract he worked continuously until the conveyance and transfer here complained of were made.

Robert Lawson was then fifty-one years of age, in good health, an experienced farmer, with 240 acres, of which one third was always in pasture to about thirty head of cattle, and had three other sons living with him aged respectively nineteen, seventeen and fourteen years. The testimony shows that for such a farm two hands were enough; that wages for good men at that time were from fifteen to twenty dollars per month for eight months of the year, without clothing or spending money, and for the other four one hand, at fifteen dollars per month at the outside.

In like manner George alone testifies to the one with him, made under the same circumstances and in the same terms, two years later, though his father was still fully capable of farm work, and was otherwise as fully provided with help; the youngest two, then aged sixteen and nineteen years, and John, being then on the place.

It is surely somewhat singular that no other evidence of these contracts, or either of them, direct or indirect, is produced; and not less so is the fact, admitted by each of the parties, that not one dollar of the twenty per month was ever paid or claimed until this conveyance was made. Nor is any explanation offered of the further fact that John, who was two years older, charged only for one more than George. It appears, indeed, that he was away from the farm, working with a threshing machine during two months or more of each of six years, earning for himself $1.25 per day, and in one of them with his team at $2.50; but he positively swears that for this it was agreed that no deduction or allowance was to be made, except that he was to settle his father's threshing bill for those years. We can account for the difference, which according to his showing was against him, only by attributing to him inadvertence through haste in making out the statement, al-

Funk v. Lawson et al.

though his counsel claim that the whole transaction was very deliberate.

Notwithstanding the unusual character of these contracts and of the manner of making them and of dealing under them, since the grantees respectively testified to them, and their father was then dead, there is perhaps no sufficient reason for doubting that they so understood, or even that the facts were as they state. But a creditor, not provided for by the arrangement here in question, who knew nothing of it and observed the boys still unmarried, at home, receiving their clothing and spending money from their father and at work apparently as before, might well be surprised and somewhat disappointed to find so large a claim, of such a character, and so grown up, suddenly appear and exhaust the means of his debtor to which he had looked for payment. And we think that in view of these circumstances—the liberality of the alleged contracts and the amount, secrecy and staleness of the claims—a court of equity ought to hold these grantees with unrelaxed strictness to show that their agreement to support the debtor and his wife was not so substantial a part of the consideration for the purchase, and therefore presumably an equivalent for so much of value in the property purchased of him, as to injure any of his creditors.

Upon a hearing on the pleadings and proofs, showing the facts as above set forth, the circuit court dismissed the bill for want of equity. For the reasons stated we think this was error, and for that error the decree is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.