[No. 1694.]

## GREGG v. THE BI-METALLIC BANK.

1. TRUSTS AND TRUSTEES—ESCROW—LIABILITY OF TRUSTEE.

Where a grantor and grantee deposited with a bank in escrow a deed to a certain lot together with a check of the vendee payable to the bank drawn on a distant bank with an agreement that the escrow bank was to deliver the deed to the vendee upon the collection of the check and a deposit by the vendee of certain capital stock in a mining company, and the check when collected was to be placed to the credit of the vendor, and the bank sent on the check for collection which was paid by a return of a draft of the payee bank on a Chicago bank, and after receiving the Chicago draft the escrow bank received a request from the vendee to return his check if not collected, for the reason that he was not satisfied with the title, and the bank on which his check was made also requested a return of the Chicago draft which was returned, in an action by the vendor against the escrow bank for the amount of the check, *held* that the defendant was the trustee for the vendor to collect the check, and that the receipt of the Chicago draft in payment of the check was a collection of the check, and it was defendant's duty to convert the draft into money and place the same to the vendor's credit, and for its failure to do so, and for its wrongful return of the draft it was liable to plaintiff for the amount of the check with interest.

2. STOPPAGE IN TRANSITU—NEGOTIABLE PAPER.

The vendor of negotiable paper has a right of stoppage *in transitu* in case of the intervening insolvency of the vendee, but he must exercise the right before the paper comes to the vendee's possession.

3. ESCROW—ESTOPPEL.

Where a deed was deposited in escrow with a bank together with the check of the vendee, with instructions to deliver the deed to the

vendee upon collection of the check and to place the proceeds of the check to the credit of the vendor, and the check was paid by a bank draft and the escrow bank voluntarily returned the draft, in an action by the vendor against the escrow bank for the amount of the check, the defendant is estopped to say that it did not receive the money on the check when by its own voluntary act it put it out of its power to receive it.

*Appeal from the District Court of Arapahoe County.*

Mr. F. E. GREGG and Mr. S. L. CARPENTER, for appellant.

Mr. J. STANLEY JONES and Mr. CHAS. C. BUTLER, for appellee.

THOMSON, J.

On April 25, 1896, a transaction took place between the appellant, a resident of Colorado, and Isaac A. Barnes, a resident of Minneapolis, Minnesota, whereby the latter purchased a lot in Cripple Creek, Colorado. The record title to the lot was in John H. Gregg, a brother of the appellant, who resided in St. Joseph, Missouri, but the appellant was interested in the proceeds of the sale. An abstract of the title to the property was procured by the appellant for Mr. Barnes, also a quitclaim deed from an outside party to cure some defect in a former deed by him, and an opinion upon the title. These papers, together with a deed to Mr. Barnes for the lot from John H. Gregg, were taken by both parties to the banking house of the appellee, and placed in an envelope which was sealed, and on which was then indorsed the following memorandum:

"CRIPPLE CREEK, COLO., Apl. 25th, 1896.
"This       witnesseth:
"That John H. Gregg has this day sold, and Isaac A. Barnes has bought, lot 10, block 17, Cripple Creek, Colo., for the following consideration, viz., $7.50 and 10,000 shares of the

capital stock of the Uncle Sam Mining & M. Co., and said Barnes deposits a check for said $750. When said money is collected on said check and said stock delivered to said bank, then said bank shall deliver to said Barnes all the within papers; said money to go to the credit of F. E. Gregg.

"J. H. GREGG,
by F. E. GREGG.
"F. E. GREGG,
"ISAAC A. BARNES."

The envelope so sealed and indorsed was then delivered to the cashier of the appellee, together with a check drawn by Barnes on the National Bank of Commerce of Minneapolis, Minnesota, payable to the order of the appellee, for $750, with authority to it to proceed in accordance with the agreement contained in the memorandum. The appellee accepted the trust and became a party to the agreement. It immediately forwarded the check of Barnes to Minneapolis for collection. The check was duly honored, and the Minneapolis bank's draft on Chicago for the amount, less exchange, sent by mail to the appellee. On the 30th day of April, 1896, the appellee received the following communication from Barnes:

"DENVER, COLO., Apl. 30th, 1896.
" The BI-METALLIC BANK,
"Cripple Creek, Colo.

"Gents: The check I made payable to you for $750, dated Apl. 25th, '96. If you have not yet sent it to Minneapolis, Minn., for collection, please send same to me at Minneapolis, Minn.

"If you have received draft from Minn. bank please return the same to the National Bank of Commerce, Minneapolis, Minn. I am not satisfied with the title to the property among other things I expected to purchase.

"Yours truly,
"ISAAC A. BARNES."

On the 1st day of May, 1896, the appellee received from the bank at Minneapolis, a telegraphic message, as follows:

"4:30 189—                MINNEAPOLIS, MINN.

"To Bi-Metallic Bank:

"Please return our draft remitting for Barnes check seven hundred and fifty.

                "NATIONAL BANK OF COMMERCE."

On the 2d day of May, 1896, the draft of the Minneapolis bank reached the appellee. The following statement accompanied the draft:

             "MINNEAPOLIS, MINN., Apl. 29, 1896.

"Nat. Bank Com.

"E. P. ARTHUR, Esq., Cas.

        "Cripple Creek, Colo.

Enclosed please find our draft on Chi.........$749.25

Exchange................................    .75
                                        —————
                                     $750.00

"In payment of collection in yours of 4 25, No. 17409.

                   Us

            "Yours respectfully,

                  "H. H. THAYER, Cashier."

Immediately upon its receipt, the appellee returned the bill to the drawer. The appellant had no notice of any of the transactions relating to the check. From time to time he inquired of the bank what had become of it, and received evasive answers which gave him no information. He remained in ignorance of what had actually occurred until July 18, 1896, when he ferreted out the facts, and discovered that the check had been paid by a draft, and the draft sent back to the drawer. He then demanded from the appellee that it account to him for the proceeds of the check and was refused. He brought this suit to recover the amount. The court deduced the following conclusions from the facts, awarding its judgment to the defendant:

"Barnes made the bank his agent for the collection of the check deposited by him for $750. Gregg had no interest in the check until the same was paid. The escrow fixes the position of the parties relative to the check very clearly:

' Said Barnes deposits a check for $750. When said money is collected on said check and said stock is delivered to said bank, then said bank shall deliver to said Barnes all the within papers ; said money to go to the credit of F. E. Gregg.'

" The stipulation shows that the Minnesota bank remitted by draft; that before the draft was received by the defendant bank, it received word from the Minnesota bank to return the draft. That is, the draft was stopped in transit. I cannot agree with counsel for plaintiff that it was a payment when the draft was mailed in Minneapolis. The Minneapolis bank controlled the paper until it was paid by the drawee bank in Chicago."

The plaintiff appeals.

The controlling facts are not disputed. They are, first, the delivery by the parties to the defendant bank of the title papers and the check, with a memorandum, signed by them, showing the purpose of the deposit, and containing the agreement by which the defendant was to be guided ; second, the acceptance by the defendant of the deposit with its accompanying conditions; third, the forwarding by it of the check to the Minneapolis bank for collection ; fourth, the payment of the check by the latter bank in a draft sent by mail to the defendant; fifth, the return by the defendant of the draft, as soon as it was received, to the bank from which it came ; and sixth, the refusal of the defendant to account to the plaintiff for the proceeds of the check.

The check was payable to the defendant, but the money for which it called belonged to the plaintiff. So far as the check was concerned, the relation of the defendant to him was that of trustee, its duty to him was that of trustee, and it owed no duty to any person other than him. The draft was sent to it in payment of the check. It was notified by the statement which accompanied the draft that the check had been paid, and that the draft represented its proceeds. Instead of converting the draft into money, and placing the amount to the plaintiff's credit, as it was bound by the conditions of the escrow to do, at the request of the Minneapolis

bank, to which it was under no obligation, it returned the draft, and thus deprived itself of the power to realize the money upon it.

The court based its judgment exonerating the defendant, upon two grounds : first, that the act of the drawer in requesting the return of the draft, was a stoppage *in transitu ;* and, second, that the drawer had the right to stop the draft in transit. Neither of these grounds is tenable. The direction to the defendant was not a stoppage *in transitu,* and no condition existed to authorize a stoppage. The doctrine of stoppage *in transitu* gives to a vendor of merchandise upon credit, the right to follow and reclaim the goods in case of the intervening insolvency of the vendee ; but he must exercise the right before they come into the vendee's possession. When they have been delivered to the purchaser, they have ceased to be in transit, and the right is at an end. *Miller v. Pondir*, 55 N. Y. 325 ; *Weber v. Baessler*, 3 Colo. App. 459. The principle which underlies the right, has been held to be available to a vendor of negotiable paper; but, as in the case of merchandise, the paper must be reclaimed while it is in transit. *Canterbury v. Bank of Sparta*, 91 Wis. 53 ; *Miller v. Pondir, supra;* Daniel on Negotiable Instruments, § 67. The Minneapolis bank did not undertake to recover the draft while it was in transit. It gave no notice to the postal authorities not to deliver it to the defendant. It addressed, instead, a request to the defendant, the payee, to send it back. The direction contemplated the delivery of the draft to the defendant, and could not possibly be effective until such delivery. But when the draft came into the defendant's hands, it was no longer in transit, and the right to reclaim it, if any existed, was at an end.

But no condition existed upon which the Minneapolis bank might lawfully reclaim this draft. It is the insolvency of the purchaser, occurring before the goods have been received by him, that authorizes the seller to stop them. The latter has received no pay for them; if they get into the buyer's hands, they will be lost to him, and in consideration of the

equities in his favor, the law permits him to protect himself by arresting the property, if he can, before it reaches its final destination. There was no such situation in this case. The Minneapolis bank did not sell the paper to the defendant on credit, and the latter did not become insolvent. The former was paid in full for the draft before it was made. In obedience to Barnes's order it transferred the amount to itself from money in its possession belonging to him, and, after deducting its charge for exchange, remitted the balance to the defendant, in the form of a draft, in accordance with the usage of banks. Barnes was bound by its act. It had received its money and needed no protection. It lost all control of the draft by committing it to the mail, and thereafter the paper was the property of the defendant, subject to the trust which it had assumed in favor of the plaintiff. *Whiting v. Bank of Rochester*, 77 N. Y. 363; *Canterbury v. Bank of Sparta, supra.*

We can only surmise the reason which the defendant assigned to itself for its action in surrendering the draft. Its answer furnishes no solution of the question, and its evidence is equally unsatisfactory. It appears that Barnes, on the day after his check was paid in Minneapolis, requested the defendant to return it to him, saying he was dissatisfied with the title to the property he had purchased. Of course, the bank did not return his check. The paper was beyond its control, and had already been paid and cancelled. The defendant nowhere says that its conduct was influenced by the communication from Barnes. But this, coupled with the message from the Minneapolis bank, furnishes the only conceivable explanation of the course the defendant pursued. If Barnes was of the opinion that he had valid cause for rescinding the sale, he could have commenced his action for the purpose, and enjoined the bank from paying over the money until the suit was determined. But he did not resort to any constituted tribunal. Although the legal title to the draft was in the defendant, in equity the plaintiff was its owner, and the bank seems to have resolved itself into a

court, rendered judgment for Barnes, and without notice to the plaintiff, confiscated his property. Its arbitrary conduct finds no extenuation in the letter of Barnes. Neither does the instruction from the bank at Minneapolis afford any better protection. That bank had no right to require a return of the draft, and the defendant had no more right to return it than the other had to demand it.

The defendant attempts to say that, by the terms of the agreement of escrow, it could incur no liability to the plaintiff until the money should come into its hands; that the draft was not money, and that it never received the money. The purpose of the draft was to produce the money. The defendant, by its own voluntary act, deprived itself of the power to obtain the money. It cannot allege its own wrong in its defense. It is estopped to say that it did not receive the money, and when it relinquished the security which represented the money, its liability to the plaintiff was complete.

The judgment will be reversed, and the district court directed to enter judgment in favor of the plaintiff for $749.25, with legal interest from the 18th day of July, 1896.

*Reversed.*